PER CURIAM.
This case is before this Court on direct appeal from a judgment of conviction of first-degree murder and a sentence of death.[1] The appellant, Matthew Lee Cay-lor, was convicted after a jury trial of first-degree murder, sexual battery involving great physical force, and aggravated child abuse. The convictions were based on the 2008 killing of thirteen-year-old Melinda Hinson in Panama City, Florida. At the end of the penalty phase of Caylor’s trial, the jury recommended the death penalty by a vote of eight to four, and the trial court followed the jury’s recommendation in its sentencing order. The trial court also imposed sentences of life in prison for sexual battery involving great physical force and thirty years in prison for aggravated child abuse. For the reasons set forth below, we affirm the convictions and sentences.
STATEMENT OF THE CASE AND FACTS
In July 2008, Melinda Hinson was living with her mother, her mother’s boyfriend, her fifteen-year-old brother, and Daryl Lawton, a family friend, in a single room at the Valu-Lodge Motel in Panama City. The family had moved to Florida from Kentucky in December 2007 and Lawton came to live with the family soon after. Due to strained finances, all five moved to the motel in mid-June. The room was *487 crowded and the children did not have school during the summer, so Melinda would spend most of her time by the motel’s pool. Melinda would also walk two dogs belonging to Scott Heinze and Tyler Nichols, who also lived at the motel, while Heinze and Nichols were at work.
According to the motel’s records, Matthew Caylor checked into the motel on June 25, 2008. At trial, Lawton testified that prior to the date of Melinda’s disappearance, he had only spoken with Caylor a few times and that he had never seen Melinda or her brother speak with Caylor. However, at around noon on July 8, Caylor came to Lawton and asked to borrow some duct tape, which Lawton took to Caylor’s room. Later in the day, Caylor called Lawton and asked if he could also borrow a steak knife. Again, Lawton went to Caylor’s room to take him the item. Law-ton recalled that Melinda and her brother accompanied him on one of these occasions, but said that they did not speak to Caylor.
Melinda was last seen alive shortly after 5 p.m. on July 8, when she returned Heinze and Nichols’ dogs to their room after taking the dogs for a walk. When Melinda did not return to her family’s room, the family first asked Heinze and Nichols whether they had seen her. Heinze told the family that he had last seen Melinda when she returned the dogs to their room. The family then searched the motel and the surrounding area. When they could not find Melinda, they called the police and reported that the girl was missing.
Melinda’s body was discovered on the morning of July 10, hidden under a bed in a room two doors down from Heinze and Nichols’ room. The body was found naked and lying face-down. The discovery was made by a housekeeper who was following the motel’s requirement of checking under the beds for trash. Although the room had been cleaned the previous day, the first housekeeper to clean the room testified that she did not look under the bed that day because her back was hurting. A review of the motel’s records revealed that Matthew Caylor had been renting the room on the day of Melinda’s disappearance. Officers of the Panama City Police Department subsequently learned that Caylor had been arrested in connection with a different criminal matter and that he was already in the custody of the Bay County Sheriffs Department.
Detective Mark Smith of the Panama City Police Department testified at trial that he interviewed Caylor after the body was discovered. He was accompanied by Investigator Mike Wesley of the Bay County Sheriffs Department, who had interrogated Caylor following the initial arrest. When Smith and Wesley went to see Caylor, Caylor said that he was glad to see the officers because he wanted to talk to them. The officers read Caylor his Miranda[2] rights, which he waived. In the interrogation that followed, Caylor confessed to the murder of Melinda Hinson and described the circumstances leading up to the crime. Based on Caylor’s statements and evidence recovered from the crime scene, Caylor was charged with first-degree murder (based on both premeditation and felony murder theories of the offense), see § 782.04(l)(a)l.-2., Fla. Stat. (2008), sexual battery involving great physical force, see § 794.011(3),- Fla. Stat. (2008), and aggravated child abuse, see § 827.03(2), Fla. Stat. (2008).
In statements made initially to the police officers and later to the trial court, Caylor gave the following account of the murder *488 and the events leading up to it. In the summer of 2008, Caylor was on felony probation in the State of Georgia based on an incident that had occurred several years before in which he was accused of molesting the fourteen-year-old daughter of a neighbor. Caylor asserted that he was falsely accused, but said that on his attorney’s advice he pled guilty to avoid a possible prison sentence. He was later required to register as a sex offender after violating the terms of his probation by being convicted of possession of cocaine. Caylor stated that after several years he became frustrated with the restrictions placed on him as a sex offender, and said that he told his probation officer that he would rather serve time in jail and be done with the sentence. Caylor said that he then went to Panama City to relax because he thought he would have to spend approximately a year and a half in jail. Caylor admitted that he had not been given permission by his probation officer to leave Georgia, even though he knew he was required to receive such permission by Georgia law.
Caylor decided to rent a room at the Valu-Lodge Motel because it was close to the beach. While in Panama City, Caylor began selling cocaine and methamphetamine. He said that he also became friends with “two Russian girls,” and that he became romantically involved with one of the girls, Marina. He said that he discovered on July 8 that the women had stolen some of his drugs. Caylor said that he borrowed a knife and duct tape with the intent of using it to threaten them to get his drugs back. He subsequently went to the women’s apartment, taking the knife and duct tape with him. Caylor said that he became violent during that encounter and decided to go back to his room at the motel. He was later arrested for the incident at the apartment.[3]
During his interrogation, Caylor told Smith and Wesley that he returned to his motel room immediately after the incident at the women’s apartment. He said that he had been back in his room for only a few minutes when Melinda Hinson knocked on his door and asked him for a cigarette. He told the officers that at the time Melinda came to his room, he felt that he had “been through all of this because of something I didn’t do,” and told the officers that he decided he was “going to make it worth it.” When asked during the Spencer hearing what he meant by these statements, Caylor responded that he meant he was angry about his prior conviction for child molestation. He told the trial court he felt that “[i]f I’m going to be in trouble for having sex with this girl being in my room, I might as well have sex with this girl.”
After Melinda entered the room, Caylor said that she sat down on the bed and that they began smoking. He asked her what she had been doing. Melinda replied that she had just finished walking a dog that belonged to the men in the next room. Caylor asked how old she was and she told him that she was thirteen. He said that he asked her why she hung out with the guys next door. Melinda responded that “they think they’re hot stuff’ but said that she “[didjn’t really like them.” According to Caylor, Melinda then told him that she thought he was “hot,” moved close to him *489 on the bed and put her arm around him. Caylor said that they started kissing, that he took her clothes off, and that they started having sex.
Caylor said that at some point he “just started choking her.” He claimed that they had stopped having sex just before he began to strangle her. He said that he “wasn’t into it” and that the intercourse lasted for only thirty to forty-five seconds. However, he said that they were still naked when he began to strangle her and that he was still on top of her. Caylor said that when he began to choke Melinda, “she was flipping out and I just wanted her to go away.” He said that she began fighting him and saying, “[L]et me ask you a question, let me ask you a question,” and that during the struggle they fell from the bed to the floor. Caylor told the officers that he then unplugged the phone cord from the wall and wrapped it around her neck. The officers asked whether Melinda was moving when he began to strangle her with the cord, and Caylor responded: “Well, yeah, it was like no, no,” When he thought Melinda was dead, he released her and plugged the phone cord back into the wall. He then lifted up the mattress and placed Melinda and her clothes under the bed. He said that he gathered his things and left the room.
Detective Smith asked Caylor why he decided to kill Melinda:
[Detective Smith:] Well, is your thoughts that now I’ve had sex with her she’s going to tell? Is that what led to that she has to die?
[Caylor:] No, it wasn’t like that, no, it wasn’t like that, it was just like, it was like, more or less like you’re the fucking reason why I’m in this situation I’m in now because I did the right thing. I think it was more of a hate, like a hate, like I was really angry, I think is what it was.
[Detective Smith:] A hate for her or a hate the fact [sic] that she’s 13 years old. [Caylor:] That she was 13 coming on to me.
Caylor said that when Melinda came into his room, he was “all pissed off about everything that has happened, not to mention the fact of what just happened at Marina’s house.” He said that Melinda “just kind of walked up at the wrong, with, you know, with that same bull shit, man, at the wrong time.”
At trial, the State called several witnesses to describe physical evidence recovered from the crime scene. Brenda Pel-frey, a crime scene investigator, identified photographs of the motel room where the body was discovered. She stated that the victim’s clothes, which were found underneath the body, were not ripped or torn and that there was no blood on the victim’s underwear. Pelfrey was also present during the autopsy, where she collected a sexual assault kit. Trevor Seifert, a crime lab analyst, testified that he found Melinda’s DNA on portions of the phone cord removed from the motel room, and that Caylor was a possible contributor to scrapings taken from under Melinda’s fingernails. Seifert also stated that vaginal swabs from the victim tested positive for blood and semen, and that Caylor’s DNA profile matched these samples.[4]
The jury also heard testimony from Dr. Michael Hunter, the medical examiner who conducted the autopsy. Dr. Hunter stated that during the examination he observed considerable injuries to the victim’s neck. He found that some of these injuries were *490 consistent with strangulation by hand, while other straight-line markings showed strangulation by ligature. He agreed that the latter markings could have been inflicted through the use of a telephone cord. Dr. Hunter noted that there were multiple straight-line abrasions, which indicated application and reapplication of the ligature. He determined that these markings were most likely inflicted while the victim was still alive. He also observed bleeding in the victim’s eyes, which provided further evidence of strangulation. Dr. Hunter ultimately concluded that the cause of death was strangulation. He said that the victim would have been in pain while she was conscious, and noted that there was no evidence of any head trauma that might have impaired her ability to feel pain or made her unaware of what was happening around her.
In addition to evidence of strangulation, Dr. Hunter observed other injuries on the body, including a bruise on the victim’s arm, a small abrasion on her left ankle, and another large bruise that extended over the length of the left side of her clavicle. He said that there was considerable bleeding underneath the clavicle bruise. Additionally, Dr. Hunter observed discoloration in the victim’s pubic area, although he said that this injury could have occurred during consensual sex. He noted that the victim was menstruating at the time of death, but found no indication as to whether she was sexually active. He said that the victim’s blood tested positive for nicotine but negative for drugs or alcohol.
After the jury convicted Caylor of all three charged offenses, a penalty proceeding was held. The State’s only witness at this proceeding was Thomas Shakitra, who testified that he was employed as a probation officer with the State of Georgia. Shakitra stated that in 2008, he was supervising Caylor, who was on felony probation. Following this testimony, the defense stipulated that Caylor had a prior felony conviction in Georgia.
The defense called four witnesses during the penalty phase. The appellant’s parents, Kimberly and Kerry Caylor, testified that they were both addicted to amphetamines while the appellant was a child and that for a time the family had no money and lived in a trailer with no power. Both parents testified that the appellant had an abusive relationship with his father, began abusing drugs at a young age, and suffered from emotional problems. A third defense witness testified that he worked with the appellant as a mechanic in Jasper, Georgia, and described the appellant’s drug problems. The final defense witness was a veterinarian who testified that Matthew Caylor had worked in the kennel area of his office for several months. He stated that Caylor -was a good employee and treated the animals well. At the end of the proceeding, the jury recommended the death penalty by a vote of eight to four.
The trial court held a Spencer hearing on November 18, 2009. Caylor testified in his own defense and described the events preceding the murder. He said that contrary to his initial statement to the police, he had used a large amount of drugs on the day of the homicide. He stated that he decided to have sex with Melinda because he was angry about the fact that he had been on probation for eight years for an offense he did not commit, and that he was angry because he found himself in a similar situation with a thirteen-year-old girl. He said that he did not rape Melinda and that he was remorseful for killing her.
In its written sentencing order, the trial court found and assigned weight to the following aggravating circumstances: (1) the capital felony was committed by a person previously convicted of a felony and *491 under a sentence of imprisonment or placed on community control or on felony probation (great weight); (2) the capital felony was committed while the defendant was engaged in the commission of sexual battery and aggravated child abuse (great weight); and (3) the capital felony was especially heinous, atrocious, or cruel (“HAC”) (great weight). The court found the following mitigating circumstances: (1) dysfunctional family (little weight); (2) under the influence of an extreme mental or emotional disturbance (some weight); (3) compassionate to animals and good employee (little weight); (4) learning difficulties (very little weight); and (5) remorse (little weight).
The trial court concluded that the nature and quality of the mitigating factors “pale[d] in comparison” to the enormity of the aggravating circumstances. Furthermore, the court determined that the aggravating circumstances clearly and convincingly outweighed the mitigating factors. Based on these determinations, the trial court imposed a sentence of death.
ISSUES ON APPEAL
Caylor raises the following claims on appeal: (1) the trial court erred in denying his motion for judgment of acquittal on the offense of aggravated child abuse; (2) the trial court erred in denying his motion for judgment of acquittal on the offense of sexual battery involving great force; (3) the trial court erred in finding as an aggravating circumstance that he committed the murder while on felony probation; (4) the trial court erred in assigning “little weight” to the “dysfunctional family” and “remorse” mitigating circumstances; (5) death is a disproportionate punishment; and (6) Florida’s death penalty is unconstitutional under the holding of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Because this is a death penalty case, we must also address .he evidence is sufficient to support a conviction for first-degree murder. See Phillips v. State, 39 So.3d 296, 308 (Fla.), cert. denied, — U.S. -, 131 S.Ct. 520, 178 L.Ed.2d 384 (2010).

Aggravated Child Abuse

As his first issue, Caylor contends that the trial court erred in denying his motion for judgment of acquittal on the offense of aggravated child abuse. In Brooks v. State, 918 So.2d 181 (Fla.2005), this Court held that where the murder of an infant was accomplished by the single act of stabbing the victim once in the chest, the act of abuse merged with the homicide. We determined that it was therefore improper to convict the defendant of both aggravated child abuse and first-degree murder. Further, because the appellant could not be convicted of aggravated child abuse as a separate offense,[5] we held that aggravated child abuse could not serve as an underlying offense to support a felony murder conviction, and that the trial court could not consider aggravated child abuse as an aggravating circumstance to support the death penalty. See id. at 198-99.[6]
*492 In his motion, Caylor argued that because the murder of Melinda Hin-son was similarly accomplished by a “single act” — in this case, strangulation — the act of aggravated child abuse, as in Brooks, merged with the homicide. The trial court denied the motion. Caylor argues here that, pursuant to Brooks, the trial court should have granted his motion for judgment of acquittal. He also argues that aggravated child abuse cannot be used as an underlying felony to support his first-degree felony murder conviction, and that it was error for the trial court to rely on the offense as an aggravating circumstance in support of its decision to impose the death penalty. “In reviewing a motion for judgment of acquittal, a de novo standard of review applies. Generally, an appellate court will not reverse a conviction that is supported by competent, substantial evidence.” Johnston v. State, 863 So.2d 271, 283 (Fla.2003) (citations omitted). We find that the offense of aggravated child abuse was supported by sufficient evidence in this case.
Brooks followed our decision in Mills v. State, 476 So.2d 172, 177 (Fla.1985), in which an appellant’s dual convictions for aggravated battery and first-degree murder were held to be improper. In Brooks, we described the facts and reasoning of Mills as follows:
In Mills, the defendant broke into a house in the middle of the night intending to steal something. When the homeowner awoke to investigate, the defendant shot and killed him. The defendant was charged with one count of felony murder, one count of burglary while armed with a firearm, and one count of aggravated battery with a firearm. This Court held that while the defendant could be found guilty of all three charges, it was not proper to convict him for aggravated battery and simultaneously for homicide as a result of one shotgun blast. Mills, 476 So.2d at 177. In that limited context, we concluded that the felonious conduct merged into one criminal act. Id. As we explained in Mills, “We do not believe that the legislature intended dual convictions for both homicide and the lethal act that caused the homicide without causing additional injury to another person or property.” Id.
Brooks, 918 So.2d at 198. As we further explained in Brooks, our determination in Mills was based on the fact that under the specific circumstances presented in that case, “the aggravated battery has merged into the homicide.” Id. Thus, it was improper to convict the appellant for both the lesser offense of aggravated battery and the greater offense of first-degree murder.
Subsequent to the Mills decision, in Brooks, the defendant was charged with killing a three-month-old infant by stabbing the child a single time in the chest. The defendant was convicted of first-degree murder and sentenced to death. Although the defendant was not convicted of aggravated child abuse during the guilt phase of trial, the trial court determined in its sentencing order that he had committed the elements of that offense and therefore relied on aggravated child abuse as an aggravating circumstance supporting the death penalty. See § 921.141(5)(d), Fla. Stat. (2002). On direct appeal, this Court determined that under Mills, the trial court’s action was improper. First, we observed that while Mills concerned a conviction for aggravated battery rather than aggravated child abuse, that case was *493 nonetheless applicable “because aggravated child abuse is an aggravated battery, the only difference being that the victim is a child.” Brooks, 918 So.2d at 198 (citing § 827.03(2), Fla. Stat. (2002)). Second, we determined that because, as in Mills, the act of battery was entirely subsumed within the homicide offense, it was improper for the trial court to rely on aggravated child abuse as an underlying felony in a felony murder conviction or as an aggravating circumstance to support the death sentence. See id. at 199.
Importantly, however, we also stated that “[gjenerally, aggravated child abuse can be a separate charge and serve as the felony in a felony murder charge.” Id. at 198 (emphasis added). We compared the facts of Brooks’ case to those in Mapps v. State, 520 So.2d 92, 93 (Fla. 4th DCA 1988), where the defendant was convicted of felony murder with the underlying offense of aggravated child abuse after committing numerous separate acts of striking, throwing, and shaking a ten-month-old child, leading to a skull fracture that caused the child’s death. While we approved of the Fourth District’s observation that “the underlying felony need not always be independent of the killing as a prerequisite for a conviction of felony murder,” we explained that the result in Mapps was correct precisely because “there were separate acts of striking, shaking, or throwing which led to the killing of the child.” Brooks, 918 So.2d at 198 (emphasis added). By contrast, we observed that Brooks’ offense “involved the single act of stabbing which caused a single injury.” Id.
As in Mapps, the evidence presented in the instant case clearly demonstrates that the victim suffered from more than a single act of aggravated battery. Caylor told the interrogating officers that he first strangled Melinda by hand, and then removed a telephone cord from the wall and used it as a ligature. Dr. Hunter, the medical examiner, testified that bruises on the victim’s neck were indicative of both manual and ligature strangulation. Dr. Hunter observed other injuries, including a bruise on the victim’s arm, an abrasion on her ankle, and another large bruise that extended over the left side of her clavicle. Thus, unlike the circumstances we reviewed in Brooks, Caylor’s conduct was not entirely subsumed within the act that caused the victim’s death; rather, there is competent, substantial evidence that Cay-lor committed numerous acts of aggravated battery that were separate from the homicide. Accordingly, the trial court did not err in denying the appellant’s motion for judgment of acquittal on the charge of aggravated child abuse, or in relying on that offense as an aggravating circumstance in its sentencing order.

Sexual Battery

In his second claim, Caylor argues that the trial court should have granted his motion for a judgment of acquittal on the offense of sexual battery involving great physical force. Section 794.011(3), Florida Statutes (2008), states:
A person who commits sexual battery upon a person 12 years of age or older, without that person’s consent, and in the process thereof uses or threatens to use a deadly weapon or uses actual physical force likely to cause serious personal injury commits a life felony, punishable as provided in s. 775.082, s. 775.083, s. 775.084, or s. 794.0115.
“Sexual battery” is defined as “oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object; however, sexual battery does not include an act done for a bona fide medical purpose.” § 794.011(l)(h), Fla. Stat. (2008). “ ‘Consent’ means intelligent, *494 knowing, and voluntary consent and does not include coerced submission. ‘Consent’ shall not be deemed or construed to mean the failure by the alleged victim to offer physical resistance to the offender.” § 794.011(l)(a), Fla. Stat. (2008).
A trial court’s ruling on a motion for judgment of acquittal is reviewed on appeal under the de novo standard of review. See Troy v. State, 948 So.2d 635, 645 (Fla.2006). An appellate court will generally not reverse a conviction that is supported by competent, substantial evidence. Id. (citing Johnston, 863 So.2d at 283). However,
[wjhere the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse.
Darling v. State, 808 So.2d 145, 155 (Fla.2002) (quoting State v. Law, 559 So.2d 187, 188 (Fla.1989)). “In meeting its burden, the State is not required to ‘rebut conclusively, every possible variation of events’ which could be inferred from the evidence, but must introduce competent evidence which is inconsistent with the defendant’s theory of events.” Johnston, 863 So.2d at 283 (quoting Darling, 808 So.2d at 156).
In this case, Caylor’s hypothesis of innocence was that the sexual activity occurred with the victim’s consent. He acknowledged both during his interrogation and at trial that sexual activity occurred, but contended that Melinda Hinson consented to and in fact initiated the sexual activity. He claimed that all injuries were inflicted not in the course of a sexual assault, but rather in the course of a nonsexual assault that occurred after they had sex. Because there is no eyewitness testimony or other direct evidence that a sexual battery occurred without consent, we review this claim under the circumstantial evidence standard of review. See Thomas v. State, 894 So.2d 126, 132 (Fla.2004). However, because we find that the State presented competent evidence that was inconsistent with Caylor’s account, we hold that the trial court’s denial of the motion is supported by the record.
Caylor is correct that some of the evidence was consistent with an initially consensual sexual encounter. A crime scene investigator testified that the victim’s clothes were found with the body and that they were not ripped or torn, which would have been evidence of forced removal. Dr. Hunter, the medical examiner, testified that although he observed some discoloration of the victim’s genitals during the autopsy, the injury could have occurred during consensual intercourse. Cf Darling, 808 So.2d at 156 (finding sufficient evidence of lack of consent to sexual activity where “the medical examiner was unequivocal in testifying that the abrasions in the victim’s vaginal area were evidence of forced sex”).
However, the State presented other evidence that was inconsistent with Caylor’s account. In Hitchcock v. State, 413 So.2d 741 (Fla.1982), we reviewed a similar claim, in which a defendant asserted that he had consensual intercourse with his thirteen-year-old niece, but that he subsequently killed her because she threatened to tell her mother about the encounter. We concluded that the evidence was sufficient for the jury to determine that the encounter was not consensual:
[T]he total circumstances, including the time of night, entry through a window, the victim’s tender years, and medical *495 testimony that the child was of previously chaste character, refuted Hitchcock’s claim of consent and could be a basis to find that the sexual battery was committed on the victim by force and against her will, thus warranting the instruction on felony murder. Under these circumstances, the jury could easily have considered Hitchcock’s contention that the girl consented to have been unreasonable.
Id. at 745.
Similarly, based on the evidence presented at trial, the jury in this case could have determined that Caylor’s account was unreasonable. It was undisputed that the victim was thirteen years old, while Caylor was thirty-three. Witnesses who were familiar with the victim testified that she was shy, that it would take her a long time to meet new people, and that she would generally only speak with an unfamiliar person if her older brother was with her. These witnesses testified that they were not aware of any prior relationship between Caylor and the victim. Caylor himself stated that they had never spoken before she allegedly knocked on his door to ask for a cigarette. As the trial court wrote in its sentencing order: “Although the Defendant argues that all of the sexual contact he had with Melinda Hinson was consensual and that she initiated it, the jury did not believe that this child consented to be sexually battered by this 33 year old, 195-pound man, whom she barely knew.” We find that sufficient evidence was presented to allow the jury to make this determination, and we reject Caylor’s claim of error.

Felony Probation Aggravator

Caylor’s third claim of error is directed toward the trial court’s sentencing order. Caylor argues that the trial court erred in finding as an aggravating circumstance that “[t]he capital felony was committed by a person previously convicted of a felony and under a sentence of imprisonment or placed on community control or on felony probation.” § 921.141(5)(a), Fla. Stat. (2008). When determining whether a trial court has properly found an aggravating circumstance, this Court applies the following standard of review:
[I]t is not this Court’s function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt — that is the trial court’s job. Rather, our task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.
Willacy v. State, 696 So.2d 693, 695 (Fla.1997) (footnote omitted).
Caylor challenges the sufficiency of the evidence supporting the trial court’s finding that he was under a sentence of felony probation at the time of the homicide. Caylor does not challenge the fact that he was on felony probation; the defense stipulated at trial that Caylor had a prior felony conviction in Georgia and his probation officer testified that he was on probation at the time of the murder. Instead, he argues that the evidence was insufficient because the State failed to demonstrate a nexus between the fact that he was on probation and the murder itself. Caylor contends that without a nexus requirement, the aggravator fails to sufficiently narrow the class of persons eligible for the death penalty, as required by Zant v. Stephens, 456 U.S. 410, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982).
As an initial matter, we find that this claim is procedurally barred because Caylor did not raise any challenge to the constitutionality of the aggravator in *496 the trial court. “[A]n argument attacking the constitutionality of an aggravating factor must be specifically raised at trial to be pursued on appeal.” Hutchinson v. State, 882 So.2d 943, 957 (Fla.2004). In this case, the record does not contain any challenge to the constitutionality of the felony probation aggravator or to the sufficiency of the evidence supporting it, even though the defense filed several motions challenging the constitutionality of other aggrava-tors.[7] The defense in fact conceded in its sentencing memorandum that the aggravator had been proven. Because the defense did not argue below that the trial court was required to find a connection between the defendant’s status as a person on felony probation and the murder, this claim is unpreserved. See id. (declining to address the appellant’s argument that the trial court improperly found the victims’ ages as mitigating circumstances where there was no causal link between the children’s ages and their deaths, because the appellant failed to raise that argument before the trial court).
Even if this claim were not barred, we would find it to be without merit. As noted above, Caylor does not dispute that he was on felony probation at the time of the murder. Instead, he argues that because this Court has imposed a nexus requirement on the “avoid arrest” aggravator, a similar requirement should apply to the felony probation aggravating circumstance. See Connor v. State, 808 So.2d 598, 610 (Fla.2001) (holding that to establish that a murder was committed for the purpose of avoiding a lawful arrest, “the State must show beyond a reasonable doubt that the sole or dominant motive for the murder was the elimination of a witness”).
However, the felony probation aggravator is substantively different from the avoid arrest aggravator. While the avoid arrest aggravator necessarily has a specific relationship to the crime, the felony probation aggravator deals with the status of the perpetrator. See Johnson v. State, 969 So.2d 938, 958 (Fla.2007) (“The ... aggravator rests on the defendant’s status as a community controllee at the time of the murder.”). This Court has rejected a similar nexus requirement for aggravators that deal with the status of the victim. In Woodel v. State, 804 So.2d 316, 325 (Fla.2001), we held that the “advanced age or disability” aggravator did not depend on whether the defendant targeted the victim based on the victim’s advanced age. Similarly, in Smith v. State, 28 So.3d 838, 865 (Fla.2009), cert. denied, — U.S.-, 131 S.Ct. 3087, 180 L.Ed.2d 912 (2011), we held that with regard to the “victim under the age of twelve” aggravator, “the State need not demonstrate that the defendant targeted the victim based upon her age.” We cited United States v. Minerd, 176 F.Supp.2d 424, 447 (W.D.Pa.2001), in which a federal district court rejected a similar claim, noting that under “the plain language of the statute the aggravator refers to the age or physical characteristics of the victim, and not to whether she was targeted because of those qualities.” See Smith, 28 So.3d at 865.
Here, the plain language of Florida’s capital sentencing statute does not make any reference to whether the defendant committed the murder because of his or *497 her status as a person on felony probation. It merely sets out as an aggravating circumstance that “[t]he capital felony was committed by a person previously convicted of a felony and ... placed on ... felony probation.” § 921.141(5)(a). Because the record contains competent, substantial evidence to support the trial court’s finding that Caylor was in fact on felony probation at the time he committed the capital offense, we reject this claim of error.

Mitigating Evidence

In the trial court’s sentencing order, the court found as mitigating circumstances that the defendant was raised in a dysfunctional family and that he felt remorse for his crimes. Caylor argues here that the trial court’s evaluation of these mitigating circumstances was deficient and that it erred in assigning them little weight. We find no error.
“[A] trial court’s written order must carefully evaluate each mitigating circumstance offered by the defendant, decide if it has been established, and assign it a proper weight.” Hurst v. State, 819 So.2d 689, 697 (Fla.2002) (citing Campbell v. State, 571 So.2d 415, 419 (Fla.1990)). “Determining whether a mitigating circumstance exists and the weight to be given to existing mitigating circumstances are matters within the discretion of the sentencing court.” Id. (citing Campbell, 571 So.2d at 420). “Furthermore, the trial court’s conclusions as to the weight of mitigating circumstances will be sustained by this Court if the conclusions are supported by sufficient evidence in the record.” Id. (citing Mansfield v. State, 758 So.2d 636, 646 (Fla.2000); Ferrell v. State, 653 So.2d 367, 371 (Fla.1995)). The evidence is sufficient when it is both competent and substantial. See Mansfield, 758 So.2d at 646.
First, with regard to the “dysfunctional family” mitigator, the sentencing order states in full:
The Defendant was the product of a dysfunctional family. The Defendant’s parents abused drugs and the Defendant began experimenting with drugs by the age of 13. The Defendant’s father would physically discipline and beat him as well as psychologically abuse him. This factor will be given little weight, especially since the Defendant’s brother raised in the same environment has been a law abiding citizen.
These findings are supported by sufficient evidence in the record. Caylor’s parents testified that they abused drugs while the defendant was a child and that Caylor was abused by his father. With regard to the trial court’s decision to assign little weight to this mitigator, the court’s observation regarding Caylor’s brother is supported by the testimony of Caylor’s mother.
Additionally, although Caylor argues that the trial court erred in failing to discuss the allegation that he was sexually abused by a family friend when he was twelve years old, we note that this allegation was presented only in the testimony of Caylor’s father, who said merely that he learned about the abuse years later. The appellant himself never testified regarding the allegation and never gave any description of the abuse or how it may have affected him. In light of the minimal nature of the evidence that was presented, we find that any error in the trial court’s failure to discuss this allegation was harmless beyond a reasonable doubt. See Douglas v. State, 878 So.2d 1246, 1258 (Fla.2004) (concluding that even if the trial court had erred in rejecting some mitigating circumstances, any error was harmless in light of the minimal amount of mitiga *498 tion the circumstances would have provided).
Second, with regard to Caylor’s assertion that he felt remorse for the crime, the trial court acknowledged in its sentencing order that Caylor had discussed his remorse for killing the victim. However, the court observed that Caylor “also tried to shift some of the blame to the victim for being in his room.” The trial court further concluded that “[i]n such self-serving statements, [Caylor] tried to minimize his responsibility in the instigation of the events.” Accordingly, the trial court assigned “little weight” to the mitigating circumstance.
Again, this finding is supported by competent and substantial evidence. On one hand, Caylor stated on several occasions that he felt remorse for the murder. Cay-lor was asked during his interrogation whether he was remorseful and he responded in the affirmative. He also said that he was sorry to the family during the Spencer hearing, offered the family a letter he had written that he said he hoped would help them, and said that what happened to Melinda “wasn’t her fault.” On the other hand, Caylor made several statements that could be construed as attempting to shift the blame to the victim for what happened. Specifically, he told the interrogating officers and the trial court that he killed Melinda because he was angry at her for being the sexual aggressor in the encounter.
It is not error for a trial court to discuss evidence of a defendant’s lack of remorse when that evidence is used to negate a proposed mitigating circumstance. See Walton v. State, 547 So.2d 622, 625 (Fla.1989); Agan v. State, 445 So.2d 326, 328 (Fla.1983). We find that the trial court’s discussion of the aggravator, and its decision to assign little weight to the defendant’s remorse, are supported by the record.

Proportionality of the Death Sentence

We next address the proportionality of the death sentence. In capital cases, this Court compares the circumstances presented in the appellant’s case with the circumstances of similar cases to determine whether death is a proportionate punishment See Wade v. State, 41 So.3d 857, 879 (Fla.2010), cert. denied, — U.S.-, 131 S.Ct. 1004, 178 L.Ed.2d 835 (2011). The purpose of this review is “to prevent the imposition of ‘unusual’ punishments contrary to article I, section 17 of the Florida Constitution.” Parker v. State, 873 So.2d 270, 291 (Fla.2004). As we have previously stated: “[T]he death penalty is ‘reserved only for those cases where the most aggravating and least mitigating circumstances exist.’ ” Smith v. State, 28 So.3d 838, 874 (Fla.2009) (quoting Terry v. State, 668 So.2d 954, 965 (Fla.1996)). However, the proportionality analysis “is not a comparison between the number of aggravating and mitigating circumstances.” Sexton v. State, 775 So.2d 923, 935 (Fla.2000) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)). “Rather, [the analysis] entails ‘a qualitative review by this Court of the underlying basis for each aggravator and mitigator.’ ” Simpson v. State, 3 So.3d 1135, 1148 (Fla.2009) (quoting Urbin v. State, 714 So.2d 411, 416 (Fla.1998)).
In this case, the trial court found three aggravating circumstances: (1) the capital felony was committed by a person previously convicted of a felony and under a sentence of imprisonment or placed on community control or on felony probation; (2) the capital felony was committed while the defendant was engaged in the commission of sexual battery and aggravated *499 child abuse; and (3) HAC.[8] The court found one statutory aggravating circumstance: Caylor was under the influence of an extreme mental or emotional disturbance. The court also found four nonstat-utory mitigators: (1) dysfunctional family; (2) compassionate to animals and a good employee; (3) learning difficulties; and (4) remorse.
This Court has previously affirmed death sentences in cases involving similar aggravating and mitigating circumstances. In Hitchcock, 413 So.2d at 743-45, we affirmed a death sentence where the defendant entered his brother’s house through a dining room window at 2:30 a.m., entered the room of his thirteen-year-old niece, sexually battered her by force and against her will, and choked and beat her to death. The trial court found in aggravation that the murder was committed in the course of an involuntary sexual battery, that the purpose of the murder was to eliminate a witness, and that the murder was especially heinous, wicked, or cruel. The sole mitigating factor was the defendant’s age of twenty years. Id. at 747.
In Davis v. State, 698 So.2d 1182 (Fla.1997), the defendant entered the home of his ex-girlfriend, kidnapped her eleven-year-old daughter, digitally penetrated the child, and then strangled her to death. The trial court found the following aggravating circumstances: the defendant was under a sentence of imprisonment at the time of the murder; the murder was committed in the course of a kidnapping and sexual battery; the murder was committed for the purpose of avoiding arrest; and HAC. Id,, at 1187. The only statutory mitigating circumstance found was that the defendant was under the influence of extreme mental or emotional disturbance at the time of the murder. The trial court also found ten mitigating circumstances, which included the defendant’s acceptance of responsibility and remorse for his actions, his lack of a history of violence, his cooperation with police, and the fact that he had suffered the effects of being placed in institutional settings at an early age and had spent a significant portion of his life in such settings. Id. This Court found that the death sentence was proportionate. See id. at 1194.
Finally, in Smith, 28 So.3d at 844-48, we upheld the imposition of a death sentence where the defendant abducted an eleven-year-old girl while she was walking home from the home of a friend, had forcible sex with her, and killed her by strangulation. Based on the markings on the victim’s neck, a medical examiner testified that the victim died from strangulation by ligature. Id. at 849-50. In aggravation, the trial court found:
(1) Smith committed the felony while he was on probation (moderate weight); (2) the murder was committed while Smith was engaged in the commission of a sexual battery or kidnapping (significant weight); (3) the murder was committed for the purpose of avoiding lawful arrest (great weight); (4) HAC (great weight); and (5) the victim was under twelve years of age (great weight).
Id. at 874. The trial court found no statutory mitigating circumstances and thirteen nonstatutory mitigators, which included *500 the defendant’s long history of mental illness and drug abuse, the fact that he was repeatedly denied or given inadequate treatment for his problems, that he maintained gainful employment, and that he was a loving father. See id. at 852-53.
We find that when compared with the cases cited above, the death sentence is proportionate. With regard to the aggravating circumstances, in all three cases cited above, as in the instant case, a defendant committed forcible sexual battery on a child and killed the child by strangulation. We observe that Caylor was also on felony probation at the time of the murder. Moreover, the trial court found that the murder in this case was heinous, atrocious and cruel, which we have stated “is among the weightiest [aggravators] in the statutory scheme.” Johnson v. State, 969 So.2d 938, 958 (Fla.2007). With regard to the mitigating circumstances, the only statutory mitigator, as in Davis, was that the defendant was under the influence of extreme mental or emotional disturbance. The trial court in this case assigned little weight to each of the remaining mitigating circumstances. In weighing the aggravating and mitigating circumstances, the trial court in this case stated: “The nature and qualities of [the mitigating] factors pales in comparison to the enormity of the circumstances in this case.” In light of these considerations, we find that death is a proportionate sentence.

Ring v. Arizona

We next address the appellant’s challenge to the constitutionality of Florida’s death penalty under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In Ring, the United States Supreme Court held that where an aggravating circumstance operates as the functional equivalent of an element of a greater offense in capital sentencing, the Sixth Amendment to the United States Constitution requires that the aggravating circumstance must be found by a jury. As Caylor acknowledges, this Court has repeatedly held that Florida’s death penalty does not violate Ring. See Bottoson v. Moore, 833 So.2d 693 (Fla.2002) (observing that the United States Supreme Court did not direct this Court to reconsider Florida’s capital sentencing statute in light of Ring); King v. Moore, 831 So.2d 143 (Fla.2002) (same); see also Darling v. State, 966 So.2d 366, 387 (Fla.2007) (“This Court has repeatedly and consistently rejected claims that Florida’s capital sentencing scheme is unconstitutional under Ring....”).
Furthermore, Caylor was contemporaneously convicted of aggravated child abuse and sexual battery involving great physical force by a unanimous jury during the guilt phase of his trial. Ring is not implicated when, as here, the trial court has found as an aggravating circumstance that the murder was committed in the course of a felony that was found by the jury during the guilt phase. See McGirth v. State, 48 So.3d 777, 795 (Fla.2010), cert. denied, — U.S.-, 131 S.Ct. 2100, 179 L.Ed.2d 898 (2011). Evidence was also presented that Caylor was on felony probation at the time of the murder based on a prior conviction, which the defense conceded during the penalty phase. For the purposes of a claim under Ring, the fact of a prior conviction does not need to be found by a jury. See Allen v. State, 854 So.2d 1255, 1262 (Fla.2003). Accordingly, Ring is not implicated in this case.

Sufficiency of the Evidence

Finally, we must address whether the evidence was sufficient to support a conviction for first-degree murder:
In death penalty cases, this Court conducts an independent review of the sufficiency of the evidence. See Insko v. *501 State, 969 So.2d 992, 1002 (Fla.2007). Regardless of whether the appellant raises this issue, the Court must “determine whether sufficient evidence exists to support a First-degree murder conviction.” Snelgrove v. State, 921 So.2d 560, 570 (Fla.2005) (citing Mansfield v. State, 758 So.2d 636, 649 (Fla.2000)). Whether the evidence is sufficient is judged by whether it is competent and substantial. See Blake v. State, 972 So.2d 839, 850 (Fla.2007).
Phillips, 39 So.3d at 308. “In conducting this review, we view the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Rodgers v. State, 948 So.2d 655, 674 (Fla.2006) (citing Bradley v. State, 787 So.2d 732, 738 (Fla.2001)). In this case, Caylor was charged with both first-degree premeditated murder and first-degree felony murder, and the jury returned a general verdict of guilty. “A general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation.” Crain v. State, 894 So.2d 59, 73 (Fla.2004).
First, there is sufficient evidence in this case to support a conviction for first-degree premeditated murder.
Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.
Bradley, 787 So.2d at 738 (quoting Woods v. State, 733 So.2d 980, 985 (Fla.1999)). Premeditation may be inferred from such facts as “the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.” Id. (quoting Norton v. State, 709 So.2d 87, 92 (Fla.1997)).
Here, Caylor stated in his interrogation that while he was engaged in sexual contact with the victim, he began choking her and that, at that moment he “just wanted her to go away.” He admitted taking the phone cord off the wall and using it as a ligature to continue strangling her. Cay-lor’s statements were corroborated by the testimony of the medical examiner, who said that the straight-line bruises on the victim’s neck were consistent with multiple applications of a ligature. The medical examiner also testified that the strangulation would have to have been constant for a minimum of two to five minutes to cause the victim’s death. Based on this evidence, the jury could have found that Cay-lor had a fully formed conscious purpose to kill at the time of the homicide. Accordingly, there was sufficient evidence that Caylor committed the homicide with “a premeditated design to effect the death of the person killed.” See § 782.04(l)(a)l., Fla. Stat. (2008).
Second, with regard to first-degree felony murder, Caylor was contemporaneously convicted of aggravated child abuse and sexual battery during the guilt phase of his trial. The unlawful killing of a human being constitutes murder in the first degree “[w]hen committed by a person engaged in the perpetration of’ any qualifying felony listed in the felony murder statute, including sexual battery and aggravated child abuse. See § 782.04(l)(a)2. As discussed previously, the State presented sufficient evidence to support the convictions for both underlying offenses. The jury could properly *502 have found that Caylor committed the murder while engaged in the perpetration of sexual battery or aggravated child abuse or both, thus supporting a conviction for first-degree felony murder.
Because competent and substantial evidence was presented to support a jury finding in favor of either first-degree murder alternative, we affirm the appellant’s first-degree murder conviction.
CONCLUSIONS
For the aforementioned reasons, we affirm the appellant’s convictions for sexual battery involving great physical force, aggravated child abuse, and first-degree murder. We also affirm the sentence of death.
It is so ordered.
PARIENTE, LEWIS, POLSTON, LABARGA, and PERRY, JJ., concur.
CANADY, C.J., concurs in result.
QUINCE, J., concurs in part and dissents in part with an opinion.

. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Although a recording of the interrogation was played at trial, certain portions of the interrogation, in which Caylor described the circumstances of his probation and the assault at the women's apartment, were edited out in order to prevent the jury from being exposed to potentially prejudicial information. Caylor later described these events in greater detail before the trial court at his Spencer hearing. See Spencer v. State, 615 So.2d 688 (Fla.1993).

. Seifert stated that the likelihood that a person unrelated to Caylor was the source of the semen was approximately one in 6.5 trillion Caucasians and one in 23 trillion Southeastern Hispanics.

. In contrast to the instant case, Brooks was not actually charged with or convicted of aggravated child abuse as a separate felony. Nonetheless, the trial court in that case relied on aggravated child abuse as an aggravating circumstance to support the death sentence. See Brooks, 918 So.2d at 199.

. We acknowledge that the scope and continued validity of Brooks have recently been called into question by several district courts of appeal. See Rosa v. State, 58 So.3d 900 (Fla. 2nd DCA 2011); Lewis v. State, 34 So.3d 183 (Fla. 1st DCA 2010), review granted, 53 So.3d 230 (Fla.2011); Sturdivant v. State,So.3d-, 2010 WL 3464410 (Fla. 1st DCA 2010), review granted, 47 So.3d 1290 (Fla. 2010). However, for the reasons discussed herein we find that the facts of the instant *492 case are distinguishable from Brooks. Therefore, we do not need to address the scope or validity of Brooks here.

. Following Caylor's conviction for first-degree murder, the defense filed motions challenging the constitutionality of the HAC ag-gravator, the constitutionality of Florida's death penalty under Ring, and the constitutionality of a death sentence based on the commission of aggravated child abuse as an aggravating circumstance. The record does not contain a similar motion challenging the constitutionality of the felony probation ag-gravator.

. Although Caylor asserts in the "Proportionality” section of his brief that the murder was not HAC, his statements during his police interview, as well as the testimony of the medical examiner, establish that the victim was strangled to death and that she was conscious when the attack began. ”[B]ecause strangulation of a conscious victim involves foreknowledge and the extreme anxiety of impending death, death by strangulation constitutes prima facie evidence of HAC.” Orme v. State, 25 So.3d 536, 551 (Fla.2009), cert. denied, - U.S. -, 130 S.Ct. 3391, 177 L.Ed.2d 309 (2010).